IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RUBY ETHRIDGE,

    Plaintiff,

v.                                                                   Civ. No. 12-897 KG/SCY

ALBUQUERQUE PUBLIC SCHOOLS, WINSTON
BROOKS, in his individual capacity, and JOHN
or JANE DOE, in his or her individual capacity

    Defendants.

MEMORANDUM OPINION AND ORDER

       This matter comes before the Court on Defendants' Motion and Memorandum Brief in Support of Their Qualified Immunity Motion for Defendants Brooks and Doe (Motion for Summary Judgment), filed December 14, 2012. (Doc. 14). Plaintiff filed a response, and Defendants filed a reply. (Docs. 15, 16). Having considered Defendants' Motion for Summary Judgment, the corresponding briefs, and the evidence of record, the Court grants Defendants' Motion for Summary Judgment.

I. Background

      *A. Plaintiff's Complaint for Violation of Civil Rights (Complaint) (Doc. 1)*

      This civil rights lawsuit arises out of allegations that Defendant Winston Brooks improperly transferred Plaintiff and failed to renew her contract. Plaintiff's Complaint contains ten counts: Count I, alleging that APS violated Title VII of the Civil Rights Act for sex discrimination; Count II, alleging that Defendant Albuquerque Public Schools (APS) violated the New Mexico Human Rights Act (NMHRA) for sex discrimination; Count III, alleging that APS retaliated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964; Count IV, alleging that APS retaliated against Plaintiff in violation of the NMHRA; Count V, alleging that

APS retaliated against Plaintiff in violation of Title IX of the Education Amendments Act of 1972; Count VII, alleging that APS and Brooks violated Plaintiff's Fourteenth Amendment's equal protection rights; Count VIII, alleging that Brooks violated Plaintiff's Fourteenth Amendment due process rights; Count IX, alleging that Defendant John or Jane Doe (Doe) violated Plaintiff's Fourteenth Amendment due process rights; Count X, alleging a breach of contract against APS.

*B. Defendants' Motion for Summary Judgment (Doc. 14)*

Brooks and Doe move for summary judgment on Counts VII, VIII, and IX of Plaintiff's Complaint and assert qualified immunity.  Brooks and Doe assert that they are entitled to qualified immunity because Plaintiff cannot establish that Brooks or Doe violated Plaintiff's clearly established constitutional rights.  Specifically, they argue that Plaintiff cannot establish that Brooks violated her equal protection rights as asserted in Count VII, because (1) she cannot show that a similarly situated employee received more favorable treatment than she did, or (2) that Brooks acted with discriminatory intent.  Additionally, they argue that Plaintiff's due process claims in Counts VIII and IX must fail because (1) Brooks did not publish his allegedly defamatory statement and (2) neither Brooks nor Doe made a statement in the course of Plaintiff's termination that foreclosed other job opportunities.

*C. Summary of Material Facts*

*1. Events surrounding Plaintiff's transfer and nonrenewal of her contract*

Between early 2008 and November 2010, APS employed Plaintiff as the Associate Superintendent of Middle Schools.  (Doc. 1) at ¶¶ 8, 52.  APS Superintendent Brooks directly supervised Plaintiff.  *Id.* ¶ 9.  On May 14, 2009, Brooks completed a Performance Evaluation of Plaintiff.  (Doc. 14-1) at 1-2.  The Performance Evaluation included rating Plaintiff on six

categories of "Core Competencies." *Id.* Brooks rated Plaintiff as "Meets" or "Exceeds" in all categories. *Id.* Additionally, Brooks made the following comments on the Performance Evaluation: "[Plaintiff] responds quickly to email and phone calls"; and, "[Plaintiff], we need to figure out the best methodology to communicate. Our middle schools are the greatest at risk, yet I know the least about. I really don't have much of a clue as to what you feel is important for our middle schools." *Id.*

On April 22, 2010, Brooks completed another Performance Evaluation, again rating Plaintiff as "Meets" or "Exceeds" in all "Core Competency" categories. *Id.* at 3-4. Brooks included the following comments in the later Performance Evaluation: "I'm still unclear as to what your 'long range' direction is with middle schools"; "[Plaintiff] works very hard!"; and "Although better, I am still the least informed regarding where we are going with middle schools that [sic] either high school or elementary schools." *Id.*

Following the Performance Evaluations, Plaintiff attempted to set a regular meeting time with Brooks. (Doc. 15-1). Plaintiff's attempts included an e-mail to Brooks and having her executive assistant contact Brooks' executive assistant to arrange a meeting time. *Id.* Plaintiff's attempts were unsuccessful. *Id.* When Plaintiff was able to set appointments with Brooks, he often would cancel the meeting. *Id.* Plaintiff states that, "[i]t was evident to me by these actions that Mr. Brooks had no intention of meeting with me." *Id.* at 2.

On September 23, 2010, Plaintiff met with Middle School Principal Cardinal Rieger, Plaintiff's subordinate, to discuss various professional performance issues. (Doc. 15-1) at 2. During the meeting, Rieger stated to Plaintiff that she would not return to being a principal the following year because she was not pleased at where she was working. *Id.* In response, Plaintiff states that,

3

> I was never close to placing Ms. Rieger on an improvement plan. I felt, however, that formal discipline was warranted because she had failed to attend mandatory principals meetings, had failed to submit certain required paperwork for her evaluation, exhibited open hostility about her placement …, , and had been rude to my staff as well as other District Personnel.

Rieger continually threated to leave her position during the school year. *Id.* On October 22, 2010, Rieger picked up her notebook and threw it back down on the table at a routine evaluation meeting. *Id.* In response, Plaintiff told Rieger that Plaintiff would be giving her a letter of reprimand, and Rieger stated that she quit. *Id.* at 3. Plaintiff also considered formally disciplining Rieger. *Id.* It is unclear whether Plaintiff and Rieger discussed formally punishing Rieger.

In early November 2010, Brooks learned that Rieger intended to resign mid-year because Plaintiff had threatened to take disciplinary action against her. (Doc. 14-2) at 1. In response, on November 11, 2010, Brooks met with Plaintiff to discuss Rieger's potential resignation. *Id.*; (Doc. 1) at ¶ 23. In an attempt to prevent Rieger's resignation, Brooks asked Plaintiff not to take any disciplinary action against Rieger. (Doc. 14-2) at 1; (Doc. 1) at ¶ 25. Plaintiff responded by accusing Brooks of disrespecting her and failing to support her administrative decisions. (Doc. 14-2) at 1; (Doc. 1) at ¶¶ 27, 29-31.

On November 12, 2010, Plaintiff sent Brooks an email stating that Rieger was "due for a memorandum" in her file, and asking Brooks not to "put [him]self in the middle" of Plaintiff's disciplinary actions. (Doc. 14-3) at 2; (Doc. 1) at ¶ 33. Brooks responded by directing Plaintiff "not to do anything further with Ms. Rieger" until Plaintiff and Brooks could "officially meet regarding [Plaintiff's] performance." (Doc. 14-3) at 2; (Doc. 1) at ¶ 34. In response, Plaintiff sent an email to Brooks and the APS School Board. (Doc. 14-3) at 1; (Doc. 1) at ¶ 39. The email accused Brooks of "harassment, yelling, [and] belittling" Plaintiff, engaging in a "wantless

4

disregard for kindness and civility," and "creating a hostile work environment." (Doc. 14-3) at 2; (Doc. 1) at ¶ 38. She also stated that any meeting with Brooks regarding her performance would be with her attorney. (Doc. 14-3) at 1-2. Mr. Brooks responded by informing Plaintiff that she would be placed on administrative leave with pay "until such time as we are able to meet." (Doc. 14-3) at 1; (Doc. 1) at ¶ 40. Brooks informed Plaintiff that he found her behavior to be "insubordinate" and found her "personal attacks against [him] [to be] both personally and professionally astonishing." (Doc. 14-3) at 1; (Doc. 1) at ¶ 40. Brooks concluded by stating that he had "little time for this kind of behavior and certainly d[id] not want to place [his] complete trust and confidence in a person who ha[d] made these types of allegations." (Doc. 14-3) at 1; (Doc. 1) at ¶ 40. Brooks sent his response to everyone Plaintiff copied on her email and copied his attorney and Andrea Trybus, APS Associate Superintendent of Human Resources. (Doc. 14-3) at 1. An unknown person provided the email exchange between Plaintiff and Brooks to the media in November 2010. (Doc. 1) at ¶ 42; Answer ¶ 42.

Shortly thereafter, on November 12, 2010, Plaintiff sent an email to various middle school principals with a subject of "Goodbye for now." (Doc. 14-4). In her email, she stated that she would "be taking sick leave beginning today," and that she knew that her email "might stir some questions," but that she would not share specific reasons for her decisions. *Id.*

On November 15, 2010, after the unknown source made public the email exchange between Plaintiff and Brooks, Brooks addressed a meeting of APS middle school principals in order to present "[his] side of the story" and explain "what the situation [was]" with Plaintiff. (Doc. 14-5) at 1. Brooks provided a brief history of his interactions with Plaintiff and events leading up to the email exchange, and reiterated his belief that he had the right to meet with administrators regarding their performance without an attorney present. *Id.* at 1-4. Brooks

concluded by explaining who would fill in for Plaintiff during her leave. *Id.* at 4. On November 16, 2010, the Albuquerque Journal published an article regarding the leaked email exchange between Plaintiff and Brooks. (Doc. 1) at ¶ 45.

On November 19, 2010, Brooks met with Plaintiff, Trybus, and Joseph Escobedo, Chief of Staff for APS. *Id.* at ¶ 47; (Doc. 14-6). The purposes of the meeting were to clarify what had happened on November 11-12, learn more about the basis for Plaintiff's harassment allegations, and determine whether Brooks could continue to work with Plaintiff. *Id.* During the meeting, Brooks explained that he needed to understand what he did that Plaintiff described as disrespectful or as constituting a hostile work environment. (Doc. 14-6) at 2. Plaintiff stated that she wanted to move forward, but refused to clarify her allegations regarding a hostile work environment. *Id.*; (Doc. 1) at ¶ 50. According to Plaintiff, Brooks spoke to her in "an accusatory tone and demanded that [she] explain to him why [she] felt intimidated and treated unfairly and why it was a hostile environment." (Doc. 15-1) at 4. Plaintiff describes the meeting as follows:

> When I tried to relay specific incidents where I felt Mr. Brooks had unnecessarily yelled at or belittled me and other employees, including Ms. Trybus, Mr. Brooks leveled unspecified charges against me stating that this had all gotten back to Wichita and said that I was "out to get" Cardinal. In addition, he said he had received phone calls from principals saying that it was about time you wised up to Ruby Ethridge and that you are on to her.

(Doc. 15-1) at 4.

According to Escobedo, "APS believes that [Brooks] needs to be able to trust and communicate with his top administrators in order to effectively oversee the school district." (Doc. 14-6) at 2. Escobedo explains further that, after the November 19, 2010, meeting, "it became apparent that [Brooks] and [Plaintiff] could not maintain the type of trusting and communicative relationship necessary for effective administration." *Id.*

6

On November 22, 2010, Brooks gave Plaintiff a letter stating that she would be reassigned to a Curriculum Assistant position at Rio Grande High School, and that her salary would remain the same for the duration of her contract. (Doc. 14-6) at 2; (Doc. 1) at ¶ 52. According to Escobedo, Brooks specifically assigned Plaintiff to the Curriculum Assistant position because (1) Plaintiff worked well with Rio Grande Principal Linda Sink, and (2) Rio Grande had many problems, and would benefit from experienced administrators. (Doc. 14-6) at 2. Plaintiff's contract specifically provided that Brooks could, in his discretion, "transfer [Plaintiff] to a different position within the District at any time during the term of this contract provided that [Plaintiff's] salary in any such position" would not decrease. (Doc. 14-7). Plaintiff's contract expired on June 30, 2011. *Id.*

Between November 23, 2010, and February 21, 2011, Plaintiff took medical leave and did not report to work at Rio Grande High School. (Doc. 14-6) at 2. At that point, Plaintiff's medical leave expired, and she requested and received extended medical leave, which she took from February 22, 2011, to June 30, 2011. *Id.* at 2-3. *Id.* at 3. Brook's office never contacted Plaintiff during that time, and Plaintiff rarely communicated with APS. *Id.*; (Doc. 15-1) at 5.

On April 5, 2011, Brooks wrote Plaintiff a letter stating that APS would not be renewing her contract for the 2011-2012 school year. (Doc. 15-4). According to Escobedo, APS did not renew Plaintiff's contract because "she failed to perform her duties at Rio Grande during the 2010-11 school year." (Doc. 14-6) at 3.

### 2. Eduardo B. Soto

Eduardo B. Soto, like Plaintiff, served as an APS Associate Superintendent supervised by Brooks. On May 15, 2009, Brooks, Soto, and Michael Bachicha, principal of Sandia High School and Soto's subordinate, met at APS headquarters. (Doc. 15-2) at 2; *see also Bachicha, et*

7

*al. v. Board of Education of the Albuquerque Public Schools, et al.*, 10-cv-710 MCA/LAM, (Doc. 230) at *3.  At the meeting, Brooks stated that Bachicha needed to quit delegating so much responsibility to a female assistant principal and that the female assistant principal "wasn't going to sleep her way to the top of this administration."  (Doc. 15-2) at 2.  Soto witnessed Brooks make the statement.  (Doc. 15-3) at 2-3.  According to Defendants, however without reference to any evidence, Soto "rather than reporting [Brooks] to APS's human resource or equal opportunity services department, took no action to protect or otherwise intervene in [Brooks'] inappropriate comments to [Soto's] staff."  (Doc. 15) at 10.

*II. Standard of Review*

Summary judgment is appropriate if there is no genuine dispute as to a material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted).  The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

Summary judgment motions involving a qualified immunity defense are determined somewhat differently than other summary judgment motions. *See Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995). "When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000). This is a heavy burden for the plaintiff. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)(citing *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)). "First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right. Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Nelson*, 207 F.3d at 1206 (citation omitted). If, and only if, the plaintiff establishes both elements of the qualified immunity test does a defendant then bear the traditional burden of showing "'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson*, 207 F.3d at 1206 (quoting *Albright*, 51 F.3d at 1535)). In other words, although the court "review[s] the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise the defendants are entitled to qualified immunity." *Cram*, 252 F.3d at 1128 (citation omitted).

III. Discussion

    A. *Qualified immunity with respect to the Due Process claims*

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 659 (10th Cir. 2006) (quoting U. S. Const. amend. XIV, § 1). It is "essentially a direction that all persons similarly situated should be

treated alike." *Grace United Methodist Church*, 451 F.3d at 659. Thus, "[t]he equal protection clause is triggered when the government treats someone differently than another who is similarly situated." *Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth.*, 933 F.2d 853, 859 (10th Cir. 1991). Although state actors must treat like cases alike, they "may treat unlike cases accordingly." *Coalition for Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1199 (10th Cir. 2008) (citation omitted). Additionally, it is well-established that "purposeful discrimination is an essential element of an equal protection violation." *Lewis v. City of Ft. Collins*, 903 F.2d 752, 755 n.1 (10th Cir. 1990).

Defendants argue that Brooks is entitled to qualified immunity on Count VIII because Plaintiff cannot establish that Brooks violated her Fourteenth Amendment rights. Specifically, Defendants argue that (1) Plaintiff cannot show that she received worse treatment than a similarly situated coworker, or (2) that Brooks purposefully discriminated against her on the basis of sex. Plaintiff argues that Defendant Brooks violated the Equal Protection Clause by demoting her to a Curriculum Assistant position and terminating her "on the basis of her sex and in retaliation for complaints of sex discrimination." (Doc. 1) at ¶ 107. Plaintiff notes in her responsive briefing that she is not claiming an equal protection clause of the Fourteenth Amendment under a "class of one theory."[1] (Doc. 15) at 11.

"For persons to be similarly situated, they must be alike 'in all relevant respects.'" *Curry v. Buescher*, 394 F. App'x 438, 447 (10th Cir. 2010) (quoting *Ritter*, 517 F.3d at 1199).[2]

---

[1] The United States Supreme Court recognizes that the equal protection clause of the Fourteenth Amendment applies to claims brought by a "class of one" where the plaintiff alleges that the state has intentionally treated he or she differently from others similarly situated and where there is no rational basis for the difference in treatment. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

[2] Although this standard originates in Title VII case law, it has been applied to § 1983 claims. *See Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004); *see also Drake v. City of*

Pursuant to this standard, "[i]ndividuals are considered similarly situated when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of comparable seriousness." *Lollis v. City of Eufaula*, 249 F. App'x 20, 26 (10th Cir. 2007) (citing *McGowan v. City of Eufaula*, 472 F.3d 736, 745 (10th Cir. 2006)). "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) (citation omitted). In the context of termination, "the similarly-situated employee need not have violated the same work rule as the plaintiff, but, rather, the employee need only have violated a work rule of 'comparable seriousness.'" *Franco v. Unified Sch. Dist. No. 437*, 2002 WL 398731 (D. Kan.) (quoting *Kendrick*, 220 F.3d at 1232).

In *Ramirez v. Dep't of Corr., Colo.*, the plaintiffs alleged that the defendant denied them equal protection based on their race and national origin as Hispanics of Mexican–American ancestry. 222 F.3d 1238, 1243 (10th Cir. 2000). The defendants moved to dismiss the plaintiffs' claim based on qualified immunity. *Id.* The Tenth Circuit Court of Appeals upheld the district court's conclusion that the plaintiffs' complaint sufficiently alleged conduct by the defendant constituted racial and national origin discrimination in violation of their equal protection rights. *Id.* The plaintiffs alleged that: the defendant made false accusations against the plaintiffs in an effort to have them disciplined, upheld unjustified reductions in performance evaluations, regularly denied supervisory positions to Hispanics of Mexican–American origin, and denied

---

*Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991) (noting that in discrimination lawsuits, "the elements of a plaintiff's case are the same . . . whether that case is brought under §§ 1981 or 1983 or Title VII").

Hispanics, including Plaintiffs, the ability to function as lead workers. *Id.* Furthermore, the plaintiffs assert that the defendant did not subject white employees to the same unjustified disciplinary actions. *Id.*

In contrast, in *Tonkovich v. Kansas Bd. of Regents* the Tenth Circuit Court of Appeals ruled that the defendants were entitled to qualified immunity against a law professor's claim that the defendants violated his Equal Protection rights. 159 F.3d 504 (10th Cir. 1998). A graduating law student complained to the law school that the professor had engaged in a sexual act with her after discussing her grades. *Id.* at 510. The defendants subsequently fired him. *Id.* The professor alleged that the defendants violated his equal protection rights because they did not penalize other professors, much less dismissed them, for dating their students. *Id.* at 532.

The Tenth Circuit granted the defendants qualified immunity because the professor failed to allege facts sufficient to establish that he is similarly situated to law professors who dated students. *Id.* The professor was accused of exploiting a student for his own private advantage by engaging her in a discussion of grades and then having sexual relations with her. *Id.* The Tenth Circuit stated that the professor "would have had to allege that other professors who had sex with a student, in a manner that exploited the student, were not treated the way he was treated by [the defendants]." *Id.* at 533.

Defendants contend that Plaintiff has not shown that she received worse treatment than a similarly situated male employee. Defendants argue that "Plaintiff has failed to identify a male APS employee supervised by Mr. Brooks who engaged in uncommunicative, disrespectful, and insubordinate conduct similar to Plaintiff's." (Doc. 14) at 9.

Plaintiff alleges that she was similarly situated to Soto because: they both worked as Associate Superintendents; Brooks supervised her and Soto; and they both were subjected to the

12

same standards governing discipline.  Additionally, Plaintiff alleges that Soto violated a work rule of comparable seriousness to Plaintiff.  Specifically, Plaintiff alleges that she "followed APS's guidelines for reporting harassing behavior," whereas Soto allegedly failed to do so after he heard Brook's derogatory comments about the female assistant principal.  (Doc. 15) at 10.  As such, Plaintiff argues that Brooks violated her Equal Protection rights by reassigning her to Curriculum Director while not punishing Soto for his misconduct.

Plaintiff's argument is unpersuasive for three reasons.  First, Plaintiff and Soto did not engage in conduct of comparable seriousness.  Plaintiff sent an email to the APS School Board accusing Brooks of "harassment, yelling, and belittling" her, engaging in a "wantless disregard for kindness and civility," and "creating a hostile work environment."  (Doc. 14-3) at 2.  In comparison, Plaintiff alleges that Soto heard Brooks say inappropriate comments about a female employee and then failed to report the conduct.  As in *Tonkovich*, Plaintiff fails to allege that Soto acted in a manner that rises to the level of Plaintiff's conduct.  Certainly, Soto's alleged failure to report Brook's inappropriate comments is incomparable to the situation between Plaintiff and Brooks.  Finally, Plaintiff fails to prove that Brooks even knew that Soto failed to report his conduct.  Therefore, Plaintiff has failed to bring forth evidence that Soto violated a work rule of comparable magnitude as the actions that she took.

Second, Brooks' action in transferring Plaintiff and the nonrenewal of her contract was based on more than Plaintiff reporting his harassing behavior.  The Court is mindful that it "should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Kendrick*, 220 F.3d at 1232.  Prior to Brooks' actions, Plaintiff (1) had a documented history of communication problems with Brooks, (2)

discounted Brooks' opinions with respect to the discipline of a principal; (3) refused to meet to discuss her performance without the presence of an attorney; (4) responded to a request to "officially meet regarding [her] performance" by sending an email to Brooks and the APS Board, accusing Brooks of harassing conduct; (5) refused to explain her allegations of harassment against Brooks; and (6) took sick leave and did not show up to work for the majority of the school year following her reassignment.  Plaintiff does not allege that Soto or any comparable male employee supervised by Brooks had a similar work history with Brooks.  This evidence only strengthens the Court's conclusion that Soto and Plaintiff were not similarly situated.

Finally, Plaintiff presents no evidence regarding Mr. Soto's actions.  Instead, she relies on the unsupported assertion of counsel that "Mr. Soto, rather than reporting Mr. Brooks to APS's human resource of equal opportunity services department, took no action to protect or otherwise intervene in Mr. Brooks' inappropriate comments."  *Id.*  This type of unsupported assertion- especially with respect to a key fact-is inadequate to preclude summary judgment.  *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1198 n. 6 (10th Cir. 2008) (stating that, "[t]o avoid summary judgment, a party must produce specific facts showing that there remains a genuine issue for trial" and that "mere conjecture" is insufficient (internal quotations omitted)).  The Court, therefore, concludes that a reasonable jury could not determine that Brooks treated Plaintiff differently than another who was similarly situated.  Consequently, Brooks is entitled to summary judgment on Count VIII.

Because the Court rules that Plaintiff cannot prove that she was treated differently than a similarly situated individual, the Court will not address arguments that Brooks acted with a discriminatory purpose when he reassigned Plaintiff and did not renew her contract.

B. *Qualified immunity with respect to the Fourteenth Amendment Due Process claims*

Plaintiff alleges in Counts VIII and XI that Brooks and Doe violated her Fourteenth Amendment due process rights. Plaintiff claims that

> Brooks' statements to the Middle School Principals Meeting accusing Plaintiff of insubordination, belligerence and anger, and lying, and his public acts of demoting her and terminating her on the basis of these publicized statements, deprived [Plaintiff], without due process, of her liberty interest in seeking out other employment and maintaining her reputation.

(Doc. 1) at ¶ 115. Plaintiff claims that "[Doe] circulated emails exchanged between [Brooks] and Plaintiff in which [Brooks] accused Plaintiff of insubordination and unprofessionalism to the Albuquerque Journal." *Id.* at ¶ 122. As a result, Plaintiff claims that the circulation of the emails "foreclosed job opportunities for Plaintiff within the Albuquerque Journal's readership area, and opened up Plaintiff to derision as a 'disgruntled employee.'" *Id.* at ¶ 123. Plaintiff, therefore, alleges that she was "deprived of her liberty interest in seeking out other employment without due process." *Id.* at ¶ 124.

An individual's reputation is a protected liberty interest, but a plaintiff alleging a deprivation of this interest in violation of due process is required to show that her reputation was damaged in connection with an adverse action taken against her. *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1153 (10th Cir. 2001). "In other words, defamation, standing alone, is not sufficient to establish a claim for deprivation of a liberty interest." *Guttman v. Khalsa*, 669 F.3d 1101, 1125 (10th Cir. 2012) (citation omitted). Instead, when plaintiffs claim that the government has injured their reputation, the Tenth Circuit applies a "stigma plus" standard. *Id.* There are two elements of a stigma-plus claim: "(1) governmental defamation and (2) an alteration in legal status." *Id.* (citation omitted). When these two

elements are present, the government may have "violate[d] a liberty interest that triggers a procedural due process protection." *Id.* Assuming a negative statement regarding a plaintiff was made, a four part test is used to determine whether the statement infringes upon a liberty interest as it affects a property interest in employment:

> First, to be actionable, the [defendant's] statements must impugn the good name, reputation, honor, or integrity of the employee. Second, the statements must be false. Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. And fourth, the statements must be published. These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest.

*Workman v. Jordan*, 32 F.3d 475, 481 (citations omitted).

Defendants argue that Brooks and Doe are entitled to qualified immunity because Plaintiff cannot establish that Brooks' statements or Doe's leaking of the emails infringed upon Plaintiff's liberty interests. Specifically, Defendants argue that Plaintiff cannot prove that Brooks' comments (1) occurred in the course of Plaintiff's termination; (2) foreclosed other employment opportunities for Plaintiff; or (3) were published. Additionally, Defendants argue that Plaintiff cannot prove that Doe's leaking of the emails (1) occurred in the course of Plaintiff's termination; and (2) foreclosed other employment opportunities for Plaintiff.

    1. *Stigma plus claim against Brooks*

        a. *Brooks' statements were not made in the course of Plaintiff's termination*

The most relevant inquiry here is into the "manner in which a public employee is terminated," as well as whether the statements were made "incident to the termination." In this regard, "a court must examine both the nature and the timing of an allegedly defamatory statement to determine whether it has been made in the course of an employee's termination." *Renaud v. Wyoming Dep't of Family Servs.*, 203 F.3d 723, 727 (10th Cir. 2000). Significantly, Brooks' statements to the middle school principals were made on November 15, 2010, five

months before Plaintiff received a letter, dated April 5, 2011, from Brooks notifying that her contract with the Albuquerque Public Schools would not be renewed." In the interim, on November 22, 2010, Plaintiff had been assigned to the administrative position of Curriculum Assistant at Rio Grande High School with no change in salary. Doc. 14-6. Notably, the assignment was made pursuant to a stipulated term in the Plaintiff's contract with APS. (Doc. 14-7). Moreover, Brooks' statements did not reflect the manner or reason for the non-renewal of Plaintiff's contract.

Brooks' statements also were made to a non-public assembly of middle school principals. *Isengard v. New Mexico Public Educ. Dept.*, 708 F.Supp.2d 1190, 1204 (D.N.M. 2009) (finding "it is not reasonable to hold, nor does the case law suggest, that a governmental officer should be held liable for communicating necessary information to the internal membership of a governmentally created and controlled group"). As the meeting commenced, Brooks ensured the audience included only principals, with the exception of three identified APS personnel members, and he requested that anyone else should leave. (Doc. 14-5). Plaintiff disagrees the information Brooks shared with the principals was "necessary" to the audience. However, it is clear Brooks' statements were in significant part responsive to Plaintiff's email on November 12, 2010, to the same audience in which she announced her sick leave and message might "stir some questions" and the scope of his statements were limited to the general circumstances surrounding her unexpected leave.

      b.   *Whether Brooks' statement foreclosed Plaintiff's job opportunities*

Plaintiff alleges that Brooks' discourse with APS middle school principals "foreclosed any opportunity for [Plaintiff] to seek any position in which she may be supervised by one of these APS administrators." (Doc. 1) at ¶ 116. However, Plaintiff was retained, and she

remained employed by APS in another position and at the same salary level. Additionally, Plaintiff cannot show she was "clearly barred" from future employment as an administrator within APS or any other employment. Plaintiff was assigned to another administrative position, however, and she fails to present any evidence that she sought jobs but was foreclosed from any opportunities as a result of Brooks' statements. *Sandoval v. City of Boulder, Colo.,* 388 F.3d 1312, 1329 (10th Cir. 2004) (citing *Workman*, and *Siegert v. Gilley*, 500 U.S. 226 (1991), and stating, "[O]ther employment opportunities must be 'foreclosed'—not merely made difficult to obtain because of damage done to the plaintiff's reputation—if the derogatory statements were not made in the context of the defendant terminating her employment").

      2. *Stigma plus claim against Doe*

Plaintiff alleges that an unknown APS employee leaked email communications between herself and Brooks to the Albuquerque Journal and thus violated her due process liberty rights. Plaintiff does not present any evidence that the emails were circulated by an APS employee. Moreover, Plaintiff failed to establish that the emails were circulated in the course of her termination of employment. She does not establish that emails related to her non-renewal of her contract. And for the same reasons as stated above, Plaintiff failed to establish Doe's actions foreclosed employment opportunities that would render her "categorically ineligible for other employment in either the public or private sector." *See Sandoval* 388 F.3d at 1329.

Accordingly, Brooks and Doe are entitled to qualified immunity because Plaintiff cannot establish that Brooks' statements or Doe's leaking of the emails infringed upon Plaintiff's liberty and property interest in her reputation and future employment. *Id*.

IT IS ORDERED that Defendants' Motion for Summary Judgment (Doc. 14) on Counts VII, VIII, and IX based on qualified immunity is granted.

_____
UNITED STATES DISTRICT JUDGE